UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  10-22175-CIV-ALTONAGA/Brown

LAWRENCE MEADOWS,

       Plaintiff,

vs.

AMERICAN AIRLINES, INC., *et al.*,

       Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court upon Plaintiff, Lawrence Meadows's ("Mr. Meadows['s]") Dispositive Motion for Summary Judgment with Statement of Undisputed Material Facts ("Pl.'s Motion") [ECF No. 31] and Defendants, American Airlines, Inc. ("AA"), American Airlines, Inc. Pilot Retirement Benefit Program, and the Pension Benefits Administration Committee's ("PBAC['s]") (collectively, "Defendants[']") Motion for Summary Judgment ("Defs.' Motion") [ECF No. 29].  The Court has carefully reviewed the parties' written submissions, the administrative record, and applicable law.

## I.  BACKGROUND[1]

This case arises under the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").  In particular, it involves a dispute over a commercial airline pilot's eligibility to receive long-term disability benefits from AA.

### A. The Plan

AA sponsors and administers a comprehensive long-term disability program for its

---

[1] Unless otherwise noted, the facts are undisputed.  References to the Administrative Record are designated with the letters "AR" followed by the stamped page number.  The Administrative Record is found at docket entry number 33.

eligible pilots called the American Airlines, Inc. Pilot Retirement Benefit Program (the "Plan"), which is governed by ERISA. (*See* Defs.' Mot. 1; AR 581–82). The Plan is funded through the Plan's Trust Fund, which is wholly owned by AA and funded by periodic, non-reversionary contributions. (*See* AR 538, 630–31). Plaintiff, Lawrence Meadows, was employed by AA as a commercial airline pilot, and by virtue of his employment, Mr. Meadows was a participant in the Plan. (*See* Pl.'s Mot. 3). Among other benefits, the Plan provides disability benefits if a Plan member is prevented from acting as a cockpit crewmember due to a "Disability" as that term is defined under the Plan. (*See* AR 550).

The Plan defines "Disability" as "an illness or injury verified through a qualified medical authority that prevents a pilot from continuing to work as a pilot for the Company."[2] (*Id.* 610). The Plan also requires a pilot to satisfy certain eligibility criteria in order to receive benefits. Eligibility is determined in accordance with the following Plan provisions:

> (a) A Member's Disability must have occurred prior to February 1, 2004;
>
> (b) A Member's Disability will be considered to have existed (and to continue to exist) only if he has received and continues to receive qualified medical care consistent with the nature of the illness or injury which gives rise to such Disability;
>
> (c) A Member's Disability will be considered to cease to exist if (i) his health is restored so as not to prevent him from acting as an Active Pilot Employee in the service of the Company, (ii) verification of such Disability can no longer be established or (iii) appropriate medical care is wantonly disregarded by such Member; . . . .

(*Id.* 731–32).

The Plan specifies that verification of a Disability is established by the Corporate Medical Director, who since 2002 has been Dr. Thomas Bettes, M.D. (*See* "Bettes Dep."

---

[2] "Company" refers to AA. (*See* AR 604).

64:23–65:1, Jan. 20, 2011 [ECF 32] Ex. B).  The Medical Department, of which Dr. Bettes is Director, handles initial claim determinations and subsequent determinations of continued disability.  (*See id.* 78:13–82:8).  The Department also keeps track of costs, although Defendants dispute Mr. Meadows's suggestion that costs are one of the factors considered when making disability determinations.  (*See id.* 136:7–137:17; Defs.' Resp. to Pl.'s Stmt. of Undisputed Material Facts ("Defs.' Resp.") [ECF No. 37] 2).

Under the Plan, if disability benefits are denied, a pilot may request a review of that denial by the PBAC.  (*See* AR 682).  The PBAC has delegated its authority to review pilot disability appeals to the Managing Director of Benefits and Productivity, who at the time of Mr. Meadows's appeal was Charlotte Teklitz.  (*See* Pl.'s Mot. Ex. D; Defs.' Resp. 3).  In addition, "[a]ny dispute as to the clinical validity of a Member's claim of the existence of a Disability or the continuation of the illness or injury which gave rise to such Disability shall be referred to a clinical authority" for further review, and "the findings  of such authority regarding the nature and extent of such illness or injury shall be final and binding upon the Administrator, the Association and the Member and his Beneficiaries."  (AR 719).

### B. Mr. Meadows's Disability Claim

Mr. Meadows was an active airline pilot with AA from October of 1991 until May of 2003 when he ceased work due to stress, irritability, and difficulty sleeping.  (*See id.* 88).  As a commercial airline pilot, Mr. Meadows's job requirements include having a valid First Class Medical Certificate, and his essential job functions include being capable of decision-making under stress; having methodical, analytical and systematic thought processes; understanding and accomplishing dynamic tasks; working cooperatively with crewmembers, peers, supervisors, and

passengers of diverse backgrounds who may hold divergent views; and, providing optimal solutions in emergency situations.  (*See* "Job Description and Essential Functions" [ECF No. 32-15] 145–47).

Medical reports submitted by Mr. Meadows indicate he had previous bouts of depression while in the Air Force and has a family history of severe depression with psychiatric hospitalization.  (*See* AR 88–89).  In May of 2003, Mr. Meadows went on sick leave, began psychotherapy with Psychiatric Clinical Nurse Specialist Robin Browdy Ross ("Nurse Ross"), and was prescribed Ativan by his flight physician.  (*See id.*).  While taking anti-anxiety and antidepressant medications, Mr. Meadows is unable to renew his Federal Aviation Administration ("FAA") Airman's Medical Certificate.[3]  (*See id.* 37).

### 1. Mr. Meadows's Claim for Benefits

On April 6, 2004, when he had almost exhausted his sick leave, Mr. Meadows applied for disability benefits through the Plan as he was advised to do by AA.  (*See id.* 1, 3–4, 37).  In his application for benefits, Mr. Meadows stated the nature of his disability was "depression requiring pharmacologic treatment."  (*Id.* 3).  At the time he applied for benefits under the Plan, medical reports from his treating practitioner, Nurse Ross, indicated Mr. Meadows was experiencing sleep problems, anxiety, and depressed mood, and cited Mr. Meadows's diagnosis as Adjustment Disorder with Anxiety.  (*See id.* 5–7).  She further reported his treatment

---

[3] Mr. Meadows explains Section 61.107 of the FAA Regulations states the use of psychoactive drugs disqualifies a pilot from obtaining an FAA Airman's Medical Certificate.  (*See* Pl.'s Mot. 6 (citing 14 C.F.R. § 61.107)).  According to Defendants, as of April 2010, the FAA does permit the use of certain antidepressant medications that pilots may take without being ineligible to obtain their medical certificate.  (*See* Defs.' Resp. 4).

consisted of individual counseling and the antidepressant medication, Welbutrin.[4]  (*See id.* 7).
At the time he applied for disability benefits, Mr. Meadows anticipated to return to work
sometime between June 30, 2004 and July 15, 2004.  (*See id.* 3, 6).

In connection with Mr. Meadows's claim, Nurse Ross also completed an Attending
Physician Statement, which stated Mr. Meadows had been in counseling and treated with
Welbutrin from November 2003 until April 2004, that his prognosis was good, and that she
expected him to return to work in July 2004.  (*See id*. 5–7).  In that statement, Nurse Ross listed
Mr. Meadows's primary diagnosis as code 309.24[5] and indicated his symptoms included "sleep
problems, anxiety, [and] depressed mood."  (*Id.* 5).  The statement also reported that "[Mr.
Meadows] is able to function under stress and engage in interpersonal relations (no
[psychological] limitations)" and that Nurse Ross did not advise him to cease his occupation.
(*Id.*).

### 2.  AA's Approval of Mr. Meadows's Claim

Initially, AA found Mr. Meadows's medical condition prevented him from performing
his occupation as an airline pilot, and determined Mr. Meadows was medically qualified for the
disability pension program.  (*See id.* 8, 57–58, 363–64).  In particular, Dr. Thomas Bettes
concluded Mr. Meadows was medically qualified for the disability pension program based on his
condition of "Depression Requiring Pharmacological Treatment."  (*Id.* 363–64).  Dr. Bettes also

---

[4]  As a result of a tapering down of the dosage of his medication over a six-week period beginning
in March 2004, Mr. Meadows had no current prescriptions for Welbutrin at the time he submitted his claim
for long-term disability benefits.  (*See* AR 37, 90).

[5]  The "309.24" code on the Attending Physician Statement correlates with the code for "Adjustment
Disorder" found in the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (DSM-IV).  (*See*
AR 402–09).

determined Mr. Meadows's disability was not based on a fear of flying, his disability would prevent him from operating as a cockpit crewmember, and there had been continued qualified medical care consistent with the nature of Mr. Meadows's illness. (*See id.*). Accordingly, Mr. Meadows's disability claim was approved on July 2, 2004. (*See id.* 8, 57–58).

### 3. *Mr. Meadows's Ongoing Treatment*

From June 2004 to August 2007, Mr. Meadows submitted periodic reports from Nurse Ross, his treating nurse practitioner. The reports indicate that in July 2004, Mr. Meadows's symptoms of anxiousness and irritable mood worsened. (*See id.* 10, 90). As a result, his Welbutrin regimen was restarted and his counseling was continued. (*See id.*). In November 2004, Mr. Meadows's prescription of Welbutrin was increased from 300 mg to 450 mg due to his irritability. (*See id.* 11, 90). Then, on June 28, 2005, Nurse Ross reported Mr. Meadows was responding well to the increase in Welbutrin and making good progress on his then current treatment regimen. (*See id.* 13). However, in September 2005, Mr. Meadows began having difficulty getting out of bed and concentrating. (*See id.* 16, 90). Consequently, Nurse Ross added Lexapro, a Selective Serotonin Reuptake Inhibitor (SSRI), to Mr. Meadows's medication regimen. (*See id.*). Due to unpleasant side effects of the Lexapro, Lamictal was later substituted into the regimen. (*See id.*).

On both January 11, 2006 and July 26, 2006, Nurse Ross reported Mr. Meadows was responding well to the new medication regimen. (*See id.* 21). Then, on January 25, 2007, Nurse Ross reported Mr. Meadows was continuing to make good progress, but was experiencing some anxiety and irritability for which he was taking Ativan. (*See id.* 82). In March 2007, Nurse Ross — while noting Mr. Meadows was still experiencing anxiety, depressive symptoms, and sleep

problems — completed an Attending Physician Statement wherein she stated Mr. Meadows was then improved and not totally disabled from performing his job.  (*See id.* 83).

### 4.  Termination of Mr. Meadows's Benefits

On October 30, 2007, AA's Medical Department sent Mr. Meadows a letter informing him his medical file was being reviewed to verify that he remained disabled.  (*See id.* 26).  The letter informed Mr. Meadows that the "AA medical doctor has requested an update in order to verify your disability status, progress, and continued treatment."  (*Id.*).  In addition, the letter asked Mr. Meadows to "have [his] treating physician(s) provide updated medical records" including "a current summary with diagnosis, results of diagnostic testing including lab, x-ray and/or special procedures . . . independent medical examiners reports or other pertinent records and expected return to work date, if applicable."  (*Id.*).  In response to the request, Nurse Ross sent a letter to AA, which stated: "[Mr. Meadows] has made consistent progress and his prognosis is good."  (*Id.* 28)  The letter also noted Mr. Meadows's symptoms of anxiety and irritable mood were greatly diminished, and that she and Mr. Meadows had discussed the idea of weaning him off the medications, which she hoped to begin in December of that year.  (*See id.*).[6]

On December 26, 2007, Dr. Bettes informed Mr. Meadows his benefits had been terminated as of that date due to lack of verification of continued disability.[7]  (*See id.* 29).  Specifically, Dr. Bettes indicated Mr. Meadows's "disability benefits [were] being terminated

---

[6] Following the letter, Mr. Meadows's Welbutrin dosage was in fact decreased from 450 mg to 300 mg.  (*See* AR 90).  However, approximately ten days after the decrease in dosage, Mr. Meadows had a re-emergence of depressive symptoms and his dosage was returned to 450 mg.  (*See id.*).

[7] The December 26, 2007 letter was incorrectly addressed and thus Mr. Meadows did not learn of the termination of his benefits until January 21, 2008 when he received a letter from the Pension Plan Administration.  (*See* AR 61–64).  At that time, Mr. Meadows requested a copy of the actual termination letter, which he received some time after January 28, 2008.  (*See id.*).

because it [could not] be established that [he had] a condition that requires ongoing treatment or that he has been properly diagnosed and treated according to recognized evidence-based treatment guidelines." (*Id.* 29–30).[8]  Dr. Bettes further noted the Medical Department had "not received results of any objective assessments or standardized scales . . . to confirm the existence of a disabling condition or document [Mr. Meadows's] response to prolonged treatment" nor had it received "results of any neuropsychological testing batteries, or copies of original office and/or progress notes, which clearly document a history of recalcitrant depressive symptoms, or that confirm [Mr. Meadows's] progress and response to ongoing therapy." (*Id.*).  The letter informed Mr. Meadows he could appeal the determination and informed him of how to do so. (*See id.*).

### C. Mr. Meadows's Appeal

#### 1. Contents of Appeal

Mr. Meadows timely appealed the termination of his benefits. (*See id.* 32–38).  In his appeal, Mr. Meadows emphasized that his use of anti-anxiety and antidepressant medications results in his inability to hold an FAA Airman's Medical Certificate and therefore prevents him from performing his duties as a cockpit crewmember. (*See id.* 37).  In support of his appeal, Mr. Meadows submitted "Psychiatric Evaluations" from Nurse Ross and Dr. Joe Culbertson. (*See id.*).

In Nurse Ross's evaluation, she reported that "[i]nitially it appeared that Mr. Meadows

---

[8]  Mr. Meadows asserts Dr. Bettes's decision to terminate Mr. Meadows's benefits was based on the fact that "Adjustment Disorder with Anxious Mood" is a limited disorder.  Defendants acknowledge one of the criteria underlying Dr. Bettes's determination to terminate Mr. Meadows's benefits was that Nurse Ross was treating Mr. Meadows for "Adjustment Disorder with Anxious Mood," and the Diagnostic and Statistical Manual (DSM-IV) indicates Adjustment Disorder is a "limited disorder."  (*Id.* 29–30; Bettes Dep. 118:14–19).  Specifically, DSM IV explains that when an Adjustment Disorder is related to an identifiable stressor, symptoms do not persist for longer than six months after termination of the stressor. (*See* Bettes Dep. 119:20–120:4).

was experiencing an Adjustment Disorder with depressed, anxious and irritable mood, triggered by external stressors," but, as treatment continued it appeared he was actually experiencing "a recurrent episode of depression." (*Id.* 90). In addition, Nurse Ross commented that Mr. Meadows's medical history "raises diagnostic questions regarding the presence of Bipolar II disorder," although Nurse Ross did not believe "the intensity and duration of those symptoms . . . meet the diagnostic criteria for Bipolar II Disorder." (*Id.*).[9] Finally, Nurse Ross noted a continued medication regimen was necessary to treat Mr. Meadows's anxiety and difficulty sleeping. (*See id.*).

Dr. Culbertson's evaluation indicated that, after interviewing Mr. Meadows and reviewing Nurse Ross's evaluation, he concurred with Nurse Ross's diagnosis and treatment plan. (*See id.* 91). Dr. Culbertson noted "the history indicates that Mr. Meadows will continue to relapse if he goes off his medications. I would expect that he would need to be on medication for the rest of his life." (*Id.*).[10]

Mr. Meadows also submitted a statement from Dr. W. Keith Martin of Virtual Flight Surgeons who confirmed that based on the diagnosis provided by Nurse Ross, and in light of Mr. Meadows's medication regimen, Mr. Meadows is disqualified from obtaining his FAA Airman's Medical Certificate. (*See id.* 94). Dr. Martin also opined he expects Mr. Meadows's disqualification to be long term. (*See id.*).

---

[9] Defendants maintain Nurse Ross arrived at these conclusions without any diagnostic testing and without the results of any objective assessments or standardized scales. (*See* Defs.' Resp. 8).

[10] Defendants similarly maintain Dr. Culbertson arrived at his conclusions without any diagnostic testing and without the results of any objective assessments or standardized scales. (*See* Defs.' Resp. 8).

Case No. 10-22175-CIV-ALTONAGA/Brown

*2. Evaluation by WME*

The Plan provides that "any dispute as to the clinical validity of a Pilot Employee's claim of the existence of a disability or the continuation of the illness or injury . . . shall be referred to a clinical authority . . . and the finding of such authority regarding the nature and extent of such illness or injury shall be final and binding . . . ." (*Id.* 719).  At the time of Mr. Meadows's disability claim, Western Medical Evaluators, Inc. ("WME") was the independent clinical authority selected by the Pilots' Union and AA to reconcile claim disputes.  (*See* Pl.'s Mot. Ex. H).  Accordingly, AA requested WME perform "an evidence-based, forensic medical review/evaluation ("peer review") on [Mr. Meadows's] case." (*Id.*).  AA specified the peer review was to be conducted "by [an] AADEP-certified and board-certified psychiatrist, in consultation with a Senior AME [Aviation Medical Examiner]." (*Id.*).  In the request, AA listed Mr. Meadows's diagnoses as "Depression, Anxiety and Adjustment Disorder." (*Id.*).

On May 27, 2008, WME, through Dr. Mark Moeller, submitted an initial report regarding Mr. Meadows's claim.  (*See id.* 158).  In his report, Dr. Moeller noted a "remarkable change" between Nurse Ross's November 16, 2007 report and her February 2008 "Psychiatric Evaluation," as she states her intention of tapering Mr. Meadows off his medications in the former, and then recommends Mr. Meadows continue with the medications indefinitely in the latter. (*Id.*).  He also commented, "[t]here is no objective evidence of why [Mr. Meadows] is on medication." (*Id.*).  Dr. Moeller wrote "[t]he evidence does not reflect appropriate treatment" and although "[r]ecords indicate that he is stable and 'responds well to the cognitive behavioral approach to therapy[,]' . . . he is not being tapered off of meds and remains off work with no return-to-work date insight [sic]." (*Id.*).  He explained appropriate treatment for Mr. Meadows's alleged conditions "would involve objective measurements of symptoms and impairments and

10

their response to goal-directed therapies and medications." (*Id.*).

Dr. Moeller further noted "[e]xcept for a one time evaluation, Mr. Meadows has not seen a specialist in the medical treatment of mood disorders" and "[s]ince [Mr. Meadows's] diagnosis and impairments are unclear, his prognosis is unclear." (*Id.*). In sum, he concluded the "evidence **does** **not** reflect objective findings of major depression or Bipolar II on or after 12/26/07," and "there is **no** **evidence** of any impairments that would disable Mr. Meadows on or after 12/26/07." (*Id.*) (emphasis in original).

Dr. Moeller also indicated he discussed the case with another WME independent medical doctor, Dr. Karen Grant, who concurred with Dr. Moeller's findings. (*See id.* 159). Indeed, in a letter dated June 5, 2008, Dr. Grant reported that "after thorough review of the medical records and consultations with Dr. Moeller . . . I agree with Dr. Moeller's assessment that this pilot has not been appropriately evaluated, tested and diagnosed with depression and bipolar disorder that causes impairment" and "he has not received appropriate counseling after 12/26/07 to document 'continued' disability from his 'depression' and 'bipolar disorder.'" (*Id.* 160). She further noted "extensive testing and evaluation by a specialist needs to be performed and documented before diagnosing and disabling this pilot probably for life." (*Id.*).

### 3. Denial of Mr. Meadows's Appeal

On June 10, 2008, AA sent a letter to Mr. Meadows informing him his appeal had been denied. (*See id.* 168). The letter stated that, after conducting an extensive review and analysis of the case, the PBAC had determined Mr. Meadows did not meet the Plan's disability definition on or after December 26, 2007. (*See id.*). Specifically, the PBAC found Mr. Meadows was "not disabled from [his] claimed condition of major depression (or from any diagnosis of bipolar II disorder), and [Mr. Meadows has] not received appropriate medical diagnosis, care and

11

treatment for any bona fide disability (as defined by the Plan) on or after December 26, 2007."

(*Id.*).  The letter also explained the standard for determining disability under the Plan differs from that used by the FAA in determining the medical certificability of a pilot:

> At this point, it should be emphasized that disability, as defined by the Plan, is the only relevant inquiry for a claim for disability benefits.  While the physician consultants' and Senior AME's observations regarding your taking FAA-disqualifying medications are documented in their respective reports, those comments and concepts are distinctly different and are irrelevant to a claim for benefits under the Plan.  The fact that a pilot might/might not be fit for duty or might be taking FAA-disqualifying medications, in and of itself, does not mean that a pilot [i]s disabled, or that he/she meets the Plan's definition of disability.  The certification relates to licensure, not disability.  The determination of disability under the terms of the Plan is based upon a pilot meeting the definition of disability under the terms of the Plan (and if disabled, upon his/her meeting the requirements for receiving qualified medical care for the condition(s) giving rise to the disability).  The Plan's terms do not define "disability" upon whether or not a pilot does/does not qualify as "fit for duty" for FAA purposes or does/does not qualify for a FAA medical certification.

(*Id*. 174–75).  Consequently, the PBAC found the discontinuation of Mr. Meadows's long-term disability benefits was proper.  (*See id.* 174).

## II.  LEGAL STANDARD

### A. Summary Judgment

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party[,]"  *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant."  *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d

1555, 1558 (11th Cir. 1990).

**B. ERISA**

ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). However, "the Supreme Court in *Firestone* established three distinct standards for reviewing an ERISA plan administrator's decision: (1) de novo where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion and the administrator has a conflict of interest." *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010) (footnote call number omitted). Cases from the Eleventh Circuit have expanded the *Firestone* test into a six-step process "'for use in judicially reviewing virtually *all* ERISA-plan benefit denials.'" *White v. Coca-Cola Co.*, 542 F.3d 848, 853 (11th Cir. 2008) (emphasis in original) (quoting *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137–38 (11th Cir. 2004)). The methodology, established in *Williams*, involves the following analysis:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Id*. at 853–54.

With regard to the sixth step of the analysis, "[u]ntil recently, [w]hen a plan administrator had a conflict of interest by both reviewing and paying claims, 'the burden shift[ed] to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest.'" *Capone*, 592 F.3d at 1195 (quoting *Brown v. Blue Cross & Blue Shield of Ala. Inc.*, 898 F.2d 1556, 1566 (11th Cir. 1990)). However, in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343 (2008), the Supreme Court called into question the heightened standard required in the sixth step of the *Williams* analysis and explained that while it agreed "the appropriate standard for reviewing a conflicted administrator's decision [is] arbitrary and capricious . . . an individualized inquiry is required to determine the circumstances of each decision." *Capone*, 592 F.3d at 1195 (citing *Glenn*, 128 S. Ct. at 2351). The Eleventh Circuit has since recognized that, in light of *Glenn*, "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1360 (11th Cir. 2008). Additionally, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.* Accordingly, the Court applies the *Williams* methodology as modified by *Glenn*.

Lastly, although this case comes before the Court on cross-motions for summary judgment, "the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil

Procedure is incongruent with the ERISA standard of review." *Pinto v. Aetna Life Ins. Co.*, No. 6:09-cv-01893-Orl-22GJK, 2011 WL 536443, at *8 (M.D. Fla. Feb. 15, 2011) (comparing FED. R. CIV. P. 56(a) and *Williams*, 373 F.3d at 1138); *see also Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir. 2002). "The Eleventh Circuit charges the district court with determining *de novo* whether the administrator's decision was wrong, *Williams*, 373 F.3d at 1138, rather than whether there is a genuine dispute as to any material fact that requires trial and whether the parties are entitled to judgment as a matter of law." *Pinto*, 2011 WL 536443 at *8. Thus, there "may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would." *Id.*; *see also Crume v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272–73 (M.D. Fla. 2006) (presenting in-depth discussion of interplay between ERISA and summary judgment standards).

### III. DISCUSSION

As an initial matter, the Court notes both parties have indicated there are no genuine issues of material fact in this case. Each party moves for summary judgment as a matter of law.

### A.    Step One: Was the Administrator's Decision Wrong?

The *Williams* analysis requires the Court to first examine whether Defendants' denial of benefits was *de novo* wrong. The Eleventh Circuit has explained:

> *De novo* review, which we employ in reviewing "no-discretion" plan decisions, offers the highest scrutiny (and thus the least judicial deference) to the administrator's decision. In fact, we accord *no* deference there, since, no judgment/discretion was exercised in making the determination (*i.e.*, there is no discretion to which we would defer).

*Williams*, 373 F.3d at 1137 (emphasis in original). Basically, "[a] decision is 'wrong' if, after *de novo* review, 'the court disagrees with the administrator's decision.'" *Capone*, 592 F.3d at 1196

(citing *Williams*, 373 F.3d at 1138).   To determine whether the administrator's decision was wrong, the Court is limited to the administrative record that was before the administrator when it made its decision.   *See Glazer v. Reliance Std. Life Ins. Co.*, 524 F.3d 1241, 1246 (11th. Cir. 2008).

The parties do not dispute that in 2004 Defendants approved Mr. Meadows's initial application for disability benefits, citing his disability as "depression requiring pharmacologic treatment."   Instead, the dispute is over whether the record demonstrates that, at the time Mr. Meadows's benefits were terminated, he still qualified as "disabled" under the Plan.   In other words, the relevant inquiry is whether at that time, Mr. Meadows was suffering from "an illness or injury verified through a qualified medical authority that prevents a pilot from continuing to work as a pilot for the Company."   (AR 610).   Mr. Meadows maintains the record shows he has a "disability" under the Plan, which existed after December 2007, and thus he was entitled to continue receiving long-term disability benefits.   (*See* Pl.'s Mot. 1–2).   Defendants maintain Mr. Meadows has not received an appropriate medical diagnosis, care, or treatment for any bona fide disability.   (*See* Defs.' Resp. 2).

A *de novo* review of the evidence presents a close question as to whether Mr. Meadows was "disabled" under the Plan on and after December 26, 2007.   On the one hand, the record demonstrates that beginning in April 2004, Nurse Ross, a Psychiatric Clinical Nurse Specialist, submitted periodic reports regarding Mr. Meadows's symptoms and ongoing treatment.   There is no question Nurse Ross's reports are at many times optimistic regarding Mr. Meadows's progress, prognosis, and ability to return to work.   (*See, e.g.,* AR 5, 7, 10, 13, 16, 18, 21, 25, 28).   Yet, notwithstanding this optimism, Nurse Ross consistently indicates Mr. Meadows suffers from sleep problems, anxiety, irritability, and a depressed mood.   (*See, e.g., id.* 5, 10, 11, 13, 21,

16

25, 28).   She also reports Mr. Meadows consistently requires treatment through counseling and an antidepressant medication regimen (although the dosage of medication has varied).  (*See, e.g., id.* 5, 7, 10, 11, 13, 16, 18, 21, 25, 28).  In her last update to AA before Mr. Meadows's benefits were terminated, Nurse Ross reports she and Mr. Meadows discussed the idea of tapering off the medications.  However, Nurse Ross never informed AA, prior to the termination of benefits, that the tapering off actually occurred or that Mr. Meadows had successfully been weaned off of the medication regimen.[11]

In February 2008, Nurse Ross submitted her "Psychiatric Evaluation" where she once again described Mr. Meadows's symptoms.   The report stated that, although she initially concluded Mr. Meadows suffered from Adjustment Disorder, a review of his condition over time revealed he was actually experiencing a recurrent episode of depression.  (*See id.* 90).   She recommended continued psychiatric medication and indicated that without the medication Mr. Meadows would experience additional episodes of depression.  (*See id.*).  Nurse Ross's diagnosis was corroborated by Dr. Joe Culbertson, Diplomate American Board of Psychiatry and Neurology, who after interviewing Mr. Meadows, reports he "fully concur[s] with Nurse Ross' diagnosis and treatment plan."  (*Id.* 91).  Dr. Culbertson further states he "would expect that [Mr. Meadows] would need to be on medication for the rest of his life."  (*Id.*).  These evaluations support Mr. Meadows's contention that he continued to suffer from symptoms of depression and/or adjustment disorder and required pharmacologic treatment on and after December 26, 2007.  As a result of the pharmacologic treatment, Mr. Meadows is unable to obtain an FAA

---

[11]  Nurse Ross later reported that when she did attempt to wean Mr. Meadows off the medication in January 2008, he experienced a re-emergence of depressive symptoms and thus the medication regimen was restarted.  (*See* AR 90).

Medical Certificate, and is thus disqualified from serving as a pilot for AA or any other company. (*See id.* 94). All of this evidence seems to indicate Mr. Meadows is entitled to long-term disability benefits under the Plan.

On the other hand, Nurse Ross also reports Mr. Meadows has no psychological limitations to functioning under stress and engaging in interpersonal relations.[12] (*See id.* 5). Additionally, although Nurse Ross continually reports symptoms of anxiety and irritability, neither she nor Mr. Meadows provides results from any objective assessments, standardized scales, or other diagnostic tests that confirm the existence of his condition. (*See id.* 83) (Attending Physician's Statement listing numerous subjective symptoms, but leaving section for "objective findings" blank). In fact, when asked on the March 2007 Attending Physician Statement when she expected "a fundamental or marked change [in Mr. Meadows's health] in the *future*[,]" Nurse Ross responded that Mr. Meadows was "*currently* improved." (*See id.*) (emphasis added). Furthermore, two *independent* medical doctors, Dr. Mark Moeller and Dr. Karen Grant, after reviewing the record, concluded there was no evidence of any impairments that would disable Mr. Meadows on or after December 26, 2007. (*See id.* 158, 160). Both of those physicians indicate Mr. Meadows has not been properly diagnosed and is not receiving appropriate treatment. (*See id.*). This evidence suggests Mr. Meadows has not established he qualifies as disabled under the Plan.

---

[12] In his Reply, Mr. Meadows asserts that, at least with respect to the March 2007 Attending Physician Statement, Nurse Ross's response regarding a lack of psychological impairments should be read in light of the fact that Mr. Meadows was taking medication at the time. (*See* Reply to Defs.' Resp. ("Pl.'s Reply") 2 [ECF No. 43]). Indeed, the March 2007 Attending Physician Statement is unclear as to whether Nurse Ross is referring to Mr. Meadows's psychological limitations while on the medication, or his psychological limitations in general. However, in the April 2004 Attending Physician Statement, it is clear Nurse Ross reports Mr. Meadows has no psychological limitations in general (as Mr. Meadows was not taking any medication during that time period).

In sum, upon careful review of the administrative record, the Court finds the medical evidence, liberally read, creates a debatable question of fact as to whether Mr. Meadows was "disabled" at the time his benefits were terminated. Nevertheless, even if the Court were to determine Defendants' decision was wrong, the Court cannot say the decision was unreasonable, for the reasons discussed below. Accordingly, summary judgment is warranted in favor of Defendants regardless of which way this question is resolved on *de novo* review.

### B. Step Two: Did the administrator have discretion?

The parties do not dispute the Plan documents expressly grant Defendants discretion in making benefit determinations. Consequently, the decision to terminate Mr. Meadows's benefits is reviewed under the deferential arbitrary and capricious standard.

### C. Step Three: Was the decision supported by reasonable grounds?

The third step of the *Williams* analysis examines whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made. *See Doyle*, 542 F.3d at 1358. As long as there is a reasonable basis for the decision, it "must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision." *White*, 542 F.3d at 856. "If the 'evidence is close,' then the administrator did not abuse its discretion, and the requisite deference compels the affirmance of the administrator's decision." *Cook v. Standard Ins. Co.*, No. 6:08-cv-759-orl-35DAB, 2010 WL 807443, at *4 (M.D. Fla. Mar. 4, 2010) (quoting *Doyle*, 542 F.3d at 1363).

Mr. Meadows asserts Defendants' decision was arbitrary and capricious in light of his FAA disqualification and inability to work as a pilot, AA's prior approval of his disability benefits, and a recent Third Circuit decision. Defendants maintain their decision was reasonable because Mr. Meadows's disability cannot be verified. Based on the following analysis, the

Case No. 10-22175-CIV-ALTONAGA/Brown

Court cannot say Defendants' determination was arbitrary and capricious.

### 1. Relevancy of FAA Disqualification

In support of his claim for benefits, Mr. Meadows points to the fact that he is unable to obtain an Airman Medical Certificate from the FAA as a result of the psychotropic medications he is taking. One of the job requirements for serving as a commercial pilot for AA is holding a valid First Class Medical Certificate from the FAA. As acknowledged by both of the WME physicians who reviewed Mr. Meadows's claim, the psychotropic medications taken by Mr. Meadows prevent him from holding an FAA Airman Medical Certificate. (*See* AR 88–89). Mr. Meadows contends that because he is taking the medications as a direct result of his alleged disability, his illness does in fact prevent him from working as a pilot for AA.

Defendants maintain FAA disqualification does not, by itself, establish disability under the Plan as the "FAA standards applied when determining whether a pilot is medically qualified to fly are different from the standards applied when determining whether a pilot is 'disabled' under the terms of the Plan." (Defs.' Resp. 12). Defendants further explain to be disabled under the Plan, "a pilot must first have an illness or injury that has been verified through a qualified medical authority; and second, it is the illness or injury that must prevent the pilot from acting as an Active Pilot Employee." (*Id.* 13 (citing AR 610)). Defendants assert Mr. Meadows does not satisfy either prong of this definition.

As an initial matter, the Court notes that to a certain extent the standard used in determining disability under the Plan is intertwined with the FAA medical standards because the language in the Plan essentially incorporates the FAA standards into the disability definition. In order to serve as an Active Pilot Employee, a pilot must satisfy the FAA standard for obtaining a Medical Certificate, because holding an FAA Medical Certificate is one of the essential

20

requirements of the job.

Nonetheless, Plan members do not qualify for disability under the Plan merely because they are disqualified by the FAA from serving as pilots.  Instead, the Plan members must satisfy additional requirements under the Plan.  In particular, Plan members must show they have an illness or injury that has been verified by a qualified medical authority.  Additionally, the Plan requires that pilots satisfy certain eligibility criteria in order to receive benefits.  Specifically, the Plan states pilots' disabilities will continue to exist only if they "continue[] to receive qualified medical care consistent with the nature of the illness or injury that gives rise to the Disability." (*Id.* 731).  Furthermore, the disability "will be considered to cease to exist if (i) [the pilot's] health is restored so as not to prevent him from acting as an Active Pilot Employee . . . (ii) verification of such Disability can no longer be established or (iii) appropriate medical care is wantonly disregarded." (*Id.*).

### 2.  *Inability to Work as a Pilot for AA*

With regard to Mr. Meadows's inability to work as a pilot, Mr. Meadows suggests the case of *Hannagan v. Piedmont Airlines, Inc.*, No. 3:07-CV-795, 2010 WL 1235395 (N.D.N.Y. Mar. 31, 2010), "could not be more on point." (Pl.'s Mot. 22).  In *Hannagan*, the court reviewed the denial of disability benefits to a pilot under an ERISA-governed plan.  *See Hannagan*, 2010 WL 1235395, at *1–3.  The pilot in that case sought disability benefits based on a diagnosis of obsessive-compulsive disorder.  *See id.*  The defendant denied the claim contending the plaintiff was "not precluded from flying because of any actual disability, but merely because a pilot cannot pass his FAA physical if taking Zoloft." *Id.* at *4 n.4.  In support of its position, the defendant in that case cited *Stanford v. Continental Casualty Co.*, 514 F.3d 354 (4th Cir. 2008), a case in which the Fourth Circuit upheld the termination of long-term disability benefits for a

nurse who, due to an acquired addiction to the painkiller Fentanyl, could not maintain his nursing license.  *See id.* at 356.  The Fourth Circuit, finding the termination of benefits proper, explained:

> It is important to remember that Stanford is not physically or mentally impaired; though prudence and his license dictate that he cannot return to his old job administering Fentanyl, he is physically and mentally capable of performing that job-and countless other jobs.  It would be truly perverse if Stanford were to go on to great success in another occupation but was still able to collect insurance checks on the basis of "disability."

*Id.* at 359–60.

The court in *Hannagan* distinguished *Stanford* explaining that in *Stanford* and other similar cases, "the evidence established that the revocations of the plaintiffs' licenses were all that precluded them from returning to work" and emphasized that "the plaintiffs' licenses were revoked because of their illegal drug use, not because of any underlying disability from which they might have suffered."  *Hannagan*, 2010 WL 1235395 at *5.  In contrast, the *Hannagan* plaintiff's "license to fly was revoked not because of illegal conduct but because of his diagnosis of mental disorders and the treatment prescribed to ameliorate their effects."  *Id.*  The court explained that "there is no limitation in the Policy stating that a person cannot be disabled, as so defined, because of the medication he is taking for the legitimate treatment of a medical condition."  *Id.*

In the instant case, to the extent Defendants contend the illness *itself*, as opposed to the medications used to treat the illness, must be the cause of Mr. Meadows's inability to work, the Court is unpersuaded.  *If* Mr. Meadows has a verified illness —  the treatment of which requires the use of psychotropic medication that disqualifies him from working as a pilot — *and if* he satisfies the other eligibility requirements under the Plan, then there is no question he would

qualify for long-term disability benefits.[13]   In other words, there is no question that if Mr. Meadows has been properly diagnosed, and he has provided proof to verify that diagnosis, then he is entitled to disability benefits.[14]

Nevertheless, Mr. Meadows is still required to demonstrate he has an illness that has been verified by a qualified medical authority and satisfy the other eligibility requirements imposed by the Plan.

### 3. Verification by a Qualified Medical Authority

There is no dispute Mr. Meadows's medication regimen precludes him from obtaining an FAA Medical Certificate; however, if those medications are improperly or unnecessarily prescribed, based on an inappropriate or incomplete medical diagnosis, then Mr. Meadows's inability to obtain a Medical Certificate does not qualify him as disabled under the Plan.

Defendants maintain Mr. Meadows's disability has not been verified.  (*See* Defs.' Resp. 4).   In particular, Defendants note there is no objective evidence "in the form of objective assessments, standardized scales, the results of neuropsychological testing batteries, consultants' reports or other diagnostic test results" verifying Mr. Meadows's continued disability.  (*Id.* 7).

---

[13]   Defendants point out that, as of April 2010, the FAA permits the use of certain antidepressant medications which pilots may take without being ineligible to obtain their medical certificate.  (*See* Defs.' Resp. 14).   Nonetheless, the Court has not been presented with any evidence indicating whether Mr. Meadows's condition can indeed be treated by those alternate medications or whether those medications were permitted for use by pilots at the time Mr. Meadows's benefits were terminated.  Thus, this point is irrelevant to the present analysis.

[14]   Mr. Meadows's Reply emphasizes that the WME reports "were focused on whether Mr. Meadows met the criteria for the diagnoses provided . . . not whether he could perform his work . . . ."  (Pl.'s Reply 8).  Thus, according to Mr. Meadows, "Defendant[s] should have sought further review." (*Id.*).  The flaw in this argument is that if Defendants determined Mr. Meadows did *not* have a verifiable illness then the fact that he could not work as a pilot due to his medications is unimportant.  In answering "no" to the question of whether Mr. Meadows has been properly diagnosed with the illness for which he is being medicated, the reviewing physicians negated the need to address his ability to work while taking those medications.

Defendants also point to the last report from Nurse Ross in which she indicated Mr. Meadows's symptoms had significantly diminished and predicted his early return to work.  (*Id.* 4; *see* AR 28).   Additionally, Defendants rely on the opinions of the independent medical doctors evaluating the sufficiency of Mr. Meadows's claim.

Based on a thorough review of the administrative record, the Court cannot categorize either this initial decision to terminate Mr. Meadows's benefits or Defendants' decision on appeal to affirm the denial as "unreasonable."  Defendants terminated Mr. Meadows's long-term disability benefits only after AA's medical director conducted a review of Mr. Meadows's records, determined there was no objective evidence of a continued disability, and requested additional documentation from Mr. Meadows's treating practitioner, which the medical director subsequently found insufficient to support Mr. Meadows's claim.  This initial determination was then reviewed by both the Plan Administrator, the PBAC, and WME, the last being an *independent* clinical authority agreed to by both AA and the Pilots' Union in the relevant collective bargaining agreement.

Specifically, two WME physicians, after carefully reviewing Mr. Meadows's claim and the relevant medical records, concluded the evidence submitted did not support a diagnosis of major depression or bipolar II on or after December 26, 2007.  The record shows the reviewing physicians plainly considered Nurse Ross's reports and Mr. Meadows's subjective complaints, and both reviewers agreed there was no evidence of any impairments that would disable Mr. Meadows on or after that time period.  Essentially, the independent medical doctors considered Nurse Ross's reports, found insufficient evidence of any disability, and rejected Nurse Ross's opinion that Mr. Meadows was suffering from depression.  Based on this evidence, it was not unreasonable for Defendants to conclude Mr. Meadows's disability could not be verified at the

time his benefits were terminated.[15]

### 4. Lack of Objective Evidence

One of the reasons cited by Defendants for the termination of Mr. Meadows's benefits was the lack of any objective evidence of a disability. The Eleventh Circuit has held "where the plan puts the burden on the claimant to prove that she is disabled, it is implicit in the requirement of proof that the evidence be objective." *Watts*, 218 F. App'x at 856 (collecting cases). Mr. Meadows asserts the Plan does not impose on him an obligation to submit objective evidence in order to prove the existence of a disability. (*See* Pl.'s Resp. 2). Yet the Plan plainly implies Mr. Meadows must present some sort of proof or evidence that can be verified.

In particular, the Plan requires the illness to be "verified by a qualified medical authority" and explains a claimant's eligibility will cease to exist if "verification of such Disability can no longer be established." (AR 809, 812). The Plan goes on to state: "Each Member . . . shall furnish to the Administrator evidence, data, or information as the Administrator considers

---

[15] To the extent Mr. Meadows suggests Defendants should have accorded more deference to his treating practitioner's reports rather than the reports of medical doctors who did not actually conduct an in-person evaluation of Mr. Meadows, this argument is foreclosed by Supreme Court precedent. In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003), the Supreme Court clarified that in the area of ERISA, opinions of treating physicians are not entitled to any greater deference than those of reviewing physicians. *See also Watts v. BellSouth Telecomms., Inc.*, 218 F. App'x 854, 856 (11th Cir. 2007). The Court held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker*, 538 U.S. at 834. Nevertheless, Plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.*; *see also Pinto*, 2011 WL 536443, at *11.

Based on the record, there is no reason to believe the reviewing physicians did not consider Nurse Ross's reports and the findings and analysis contained therein. In the absence of any indication that the reviewing physicians refused to credit Nurse Ross's conclusions, "the Court cannot require Defendant[s] to afford any special, or increased, deference to the treating physicians." *Pinto*, 2011 WL 536443, at *11.

necessary for the purpose of administering the Plan." (*Id.* 679). In addition, the "Pilot Retirement Benefit Program Summary Plan Description" (*id.* 515–92), explains disability benefits will end when the pilot "[c]an no longer provide verification of the disability" (*id.* 551). The language of these documents indicates the pilot has an obligation to provide verification of the alleged disability, and the administrator has some discretion in determining what evidence is necessary in administering the Plan. In light of those provisions, it is not unreasonable for Defendants to require Mr. Meadows to provide objective evidence proving eligibility for benefits.

"Case law supports the conclusion that it is reasonable for a plan administrator to require objective medical evidence even where the plan does not specifically contain such a requirement." *Fick v. Metro. Life Ins. Co.*, 347 F. Supp. 2d 1271, 1286 (S.D. Fla. 2004). In *Fick*, the court reasoned that "[w]here a plan requires proof of continued disability, 'the very concept of proof connotes objectivity'. . . . In the absence of a requirement of objective evidence, the review of claims for long-term disability benefits would be 'meaningless because a plan administrator would have to accept all subjective claims of the participant without question.'" *Id.* (citing *Maniatty v. Unumprovident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002)). The court recognized "'[w]ere an opposite rule to apply, [long-term disability] benefits would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional.'" *Id.* (quoting *Coffman v. Metro., Life Ins. Co.*, 217 F. Supp. 2d 715, 732 (S.D.W. Va. 2002)). This reasoning is consistent with several Eleventh Circuit cases. *See, e.g., Wangenstein v. Equifax, Inc.*, 191 F. App'x 905, 913–14 (11th Cir. 2006) (holding it is not unreasonable for a plan administrator to demand objective evidence where the administrator has discretion to determine

what it considers adequate proof of disability); *Keith v. Prudential Ins. Co of Am.*, 347 F. App'x 548, 551 (11th Cir. 2009) (same); *see also Coates v. Guardian Life Ins. Co. of Am.*, No. 8:07-cv-291-T-26TBM, 2009 WL 1043981, at *4 (M.D. Fla. Apr. 16, 2009). ("Even without a provision in the Plan, case law provides that it is reasonable for an administrator to require objective medical evidence.").

Nevertheless, Mr. Meadows contends the Eleventh Circuit's holding in *Oliver v. Coca-Cola*, 497 F.3d 1181 (11th Cir. 2007) (vacated in part by 506 F.3d 1316), is controlling here. In *Oliver*, the Eleventh Circuit, noting the plan at issue did not require objective evidence for entitlement to benefits, found it arbitrary and capricious to deny benefits for fibromyalgia and chronic pain syndrome based solely on an alleged lack of objective evidence to corroborate the employee's subjective complaints of pain. *Id.* at 1196. However, the instant case is materially distinguishable from *Oliver* for several reasons.

First, in *Oliver*, the administrator's decision was based *solely* on the lack of objective evidence, and benefits were denied despite the fact than the plan participant submitted *uncontroverted* medical evidence of the *only sort available* to prove his disability. *Id.* Specifically, the claimant presented voluminous documentation from at least **six** treating physicians "including records of physical examinations, treatment notes, and the results of several objective diagnostic laboratory tests including an MRI, two EMGs, and a nerve conduction test that supported his treating physicians' diagnoses." *Id.* The reports from the multiple treating physicians reflected a *consistent* diagnosis of the disabilities. *See id.*

In contrast, Mr. Meadows only submitted medical reports from one treating practitioner, Nurse Ross, none of which referenced any results from an objective or diagnostic test. Moreover, the diagnoses contained in those reports were not entirely consistent. For example, in

Nurse Ross's initial statement she lists Mr. Meadows's diagnosis as Adjustment Disorder, but in her February 2008 evaluation, she indicates a review of his condition over time revealed he was actually experiencing a recurrent episode of depression.  (*See* AR 90).  In addition, the lack of objective evidence was not the sole reason for termination of Mr. Meadows's benefits. Defendants relied on the review of two independent medical doctors, reports from Mr. Meadows's treating practitioner, the fact that the initial diagnosis was a limited disorder under the DSM, and other relevant considerations in making their determination.  Furthermore, the alleged disability is not of the type where the only sort of evidence available is subjective evidence; to the contrary, as the reports by the independent WME physicians indicate, "appropriate treatment for major depression or Bipolar II would involve objective measurements of symptoms and impairments."  (*Id.* 159; *see also id.* 160).

Additionally, in *Oliver*, the reports submitted by the treating physicians "established *unequivocally* that he could not work."  *Oliver*, 497 F.3d at 1196 (emphasis added).  In the instant case, Nurse Ross's initial reports indicated she found no psychological limitation to Mr. Meadows's ability to perform his job, and her subsequent reports were generally optimistic with regard to his ability to return to work in the near future.  (*See* AR 5, 7, 10, 13, 16, 18, 21, 25, 28).

Finally, the plan at issue in *Oliver* contained a specific provision allowing the employer to require the applicant to submit to a medical examination by a doctor of the employer's choosing.  *See Oliver*, 497 F.3d at 1197.  Thus, the company had a means by which to verify the disability regardless of whether the claimant provided his own medical evidence.  Here, no such right is granted to Defendants in the Plan.  Consequently, Defendants must rely solely on the medical evidence submitted by Mr. Meadows; it does not seem unreasonable for Defendants to require that evidence to be objective rather than subjective.

In sum, it was not arbitrary or capricious for Defendants to require Mr. Meadows to provide something more than subjective evidence to demonstrate he suffered from an illness, which was verified by a qualified medical authority, that prevented him from working as a pilot for AA.  Although Nurse Ross identifies subjective evidence of Mr. Meadows's symptoms, she admittedly fails to present any *objective* evidence regarding Mr. Meadows's claimed disability. (*See* AR 83).  This failure to present any objective evidence weighs in favor of a finding that Defendants' decision to terminate Mr. Meadows's benefits was reasonable.

Furthermore, even if the Court were to conclude the Plan does not require objective evidence, Defendants' determination is still reasonable.  The Eleventh Circuit has held even where a court finds the plan does not require objective evidence, a court must evaluate:

> the reasonableness of the decision in light of the sufficiency of the claimant's subjective evidence and the administrator's actions.  Assuming the claimant has put forward ample subjective evidence, [the court] look[s] to what efforts the administrator made to evaluate the veracity of [the] claim, particularly focusing on whether the administrator identified any objective evidence that would have proved the claim and on what kinds of independent evaluations it conducted.

*Creel v. Wachovia Corp.*, No. 08-10961, 2009 WL 179584, at *7 (11th Cir. Jan. 27, 2009).

Defendants, in an effort to evaluate the veracity of the evidence presented, requested independent evaluations be conducted.  The record shows Defendants carefully considered those evaluations in conjunction with the reports submitted by Mr. Meadows in making their determinations.  Defendants also identified specific types of objective evidence that could have been used in diagnosing the claimed disability.  (*See, e.g.,* AR 29).  Considering all of the evidence, Defendants then concluded Mr. Meadows did not qualify as disabled under the Plan on or after December 26, 2007.  The Court cannot say this determination was unreasonable.

### 5.  *Relevance of the Third Circuit's Decision in Miller v. American Airlines*

In his written submissions, Mr. Meadows places emphasis on the recent Third Circuit case of *Miller v. American Airlines*, No. 10-1784, 2011 WL 208291 (3d Cir. Jan. 25, 2011).[16]  In that case, the Third Circuit reversed a district court's ruling, finding American Airlines' decision to terminate a pilot's long-term disability benefits was arbitrary and capricious.  The instant case is significantly different from *Miller* for several reasons.

As an initial matter, the Court notes that in *Miller* it was undisputed the claimant, Mr. Miller, experienced a psychotic episode while piloting a plane.  *See Report & Recommendation*, 2009 WL 6039583, at * 1.  In fact, Mr. Miller had to be physically removed from the plane and committed to the psychiatric ward of a hospital, where he was diagnosed with severe psychosis. *See id.*   The hospital's discharge summary indicated his psychosis "was characterized by grandiosity, liability and delusions, which would suggest a manic condition."  *Miller I*, 2010 WL 890016, ECF No. 21-7, at 4.  Thus, in that case, the evidence unequivocally demonstrated that, at least initially, the claimant suffered from a serious psychological illness.  In contrast, here, the only evidence of Mr. Meadows's symptoms or illness come directly from Mr. Meadows's subjective complaints and Nurse Ross's memorialization of those complaints.

More importantly, *Miller* involved numerous "procedural and substantive oversights" by Defendants which counseled against a determination that AA's decision was reasonable.  Indeed, in the initial Report and Recommendation, the magistrate judge explained that:

The Court is constrained to note, at the outset, that it recommends no conclusion

---

[16]  For purposes of clarity, opinions involved in the *Miller* case are renamed as follows: *Miller v. Am. Airlines, Inc.*, No. 08-CV-277, 2009 WL 6039583 (M.D. Pa. Nov. 30, 2009) ("*Report & Recommendation*"), *rejected by*, No. CIVA 3:08-CV-277, 2010 WL 890016 (M.D. Pa. Mar. 8, 2010) ("*Miller I*"), *reversed by* 2011 WL 208291 (3d Cir. 2011) ("*Miller II*").  All docket entry numbers contained in this section pertain to the *Miller* cases rather than Mr. Meadows's case.

> as to whether Plaintiff does, in fact, continue to qualify for long-term disability
> benefits under Defendants' plan, or whether Defendants may have a reasonable
> basis to pursue the termination of Plaintiff's benefits under the plan. Instead, it is
> recommended only that the Court find that the procedures that were followed with
> respect to Defendants' termination of Plaintiff's benefits, as well as the
> substantive bases given therefor, were sufficiently lacking so as to be arbitrary
> and capricious, and therefore that the termination of benefits should be vacated.
> In short, it is recommended that the parties be returned to the status quo ante the
> benefits termination and the subsequent appeal thereof.

*Report & Recommendation* 2009 WL 6039583, at *1 n.1.  The Third Circuit later echoed those

concerns stating: "We hold that the termination of Miller's benefits was arbitrary and capricious

in light of the numerous substantive deficiencies and procedural irregularities that pervaded

American's decision-making process." *Miller II*, 2011 WL 208291, at *1.  As discussed below,

those procedural and substantive deficiencies are not present in the instant case.

First, in *Miller*, the Third Circuit emphasized that neither the disability termination letter

nor the reports from the independent WME consultants, Dr. Crain and Dr. Seskind, addressed

each of Mr. Miller's diagnoses.  *See id.* at *12–13.  The court explained that although AA

instructed the WME physicians to evaluate Mr. Miller's claims that he suffered from two

conditions — brief reactive psychosis and anxiety disorder — neither Dr. Crain nor Dr. Seskind

devoted any discussion to Mr. Miller's anxiety diagnosis.  *See Miller II*, 2011 WL 208291, at

*13.  Instead the reports focused solely on the diagnosis of psychosis.  The court held that "[a]n

administrator's failure to address all relevant diagnoses in terminating a claimant's benefits is []

a cause for concern that suggests the decision may have been arbitrary and capricious."  *Miller*

*II*, 2011 WL 208291, at *12.  The court further explained that "given that American did not

mention the anxiety diagnosis in its termination letter and the WME report was incomplete in its

analysis, American cannot be said to have fully considered all of Miller's diagnoses."  *Id.* at *13.

Mr. Meadows asserts the instant case is analogous to *Miller* in that "the WME reports did

not contain any actual consideration of the Plaintiff's anxiety." (Pl.'s Reply 7). He further contends that, in light of *Miller*, this failure renders Defendants' decision arbitrary and capricious. (*See id.*). However, Mr. Meadows's argument fails because the procedural deficiency present in *Miller* is not present here. In contrast to *Miller,* the termination letter in this case *did* address Mr. Meadows's claimed disability of "Adjustment Disorder with Anxious Mood." In fact, in the termination letter, Dr. Bettes analyzed the DSM entry that corresponds with that disorder. Then, in response to the termination letter and Dr. Bettes's analysis, Nurse Ross completed a psychiatric evaluation in which she stated she no longer believed Mr. Meadows was suffering from Adjustment Disorder with Anxiety. On this point she stated that although "[i]nitially it appeared that Mr. Meadows was experiencing an Adjustment Disorder with depressed, anxious and irritable mood . . . [a]s treatment continued it appeared Mr. Meadows was in fact experiencing a recurrent episode of depression." (AR 90). She also voiced her concerns regarding the possibility of bipolar disorder. After reviewing Nurse Ross's reports, the WME physicians specifically considered each of those two diagnoses in evaluating Mr. Meadows's condition. In addition, the physicians reported "[t]here [was] **no evidence** of *any* impairments that would disable Mr. Meadows on or after 12/26/07." (*Id.*) (second emphasis added). Defendants adequately considered all of Mr. Meadows's alleged diagnoses in making their disability determination.

Second, in *Miller*, the WME reports were internally inconsistent, as the conclusions reached in those reports were unsupported by the findings contained therein. *See id.* at *13; *Report & Recommendation*, 2009 WL 6049583, at *7. For instance, in his report, Dr. Crain began by acknowledging Mr. Miller had experienced an "apparent manic psychotic episode" and reporting there existed "a risk that Mr. Miller could have another, under circumstances similar to

those that preceded the first." *Miller I*, 2010 WL 890016, ECF No. 21-7, at 5.  In addition, he cited a report from Mr. Miller's treating physician which stated that "[n]o medical treatment could revert, undue, or cure [Mr. Miller's] underlying condition." *Id.*  He further opined that "[n]o amount of medical monitoring can prevent this from happening, except to begin active treatment right away to avert a full-blown psychosis." *Id.*  Then, notwithstanding his statement that only immediate active treatment could effectively guard against a recurrent psychotic episode and his failure to consider Mr. Miller's anxiety diagnosis, Dr. Crain offered an ultimate opinion that "[t]here is no evidence of a continuing mental disorder that requires treatment by a psychiatrist." *Id.*  The only explanation offered for this seemingly unsupported conclusion was a statement by Dr. Crain that he "*assume[d]* that now, after nine years, these issues have been dealt with through psychotherapy." *Id.* (emphasis added).  Similarly, Dr. Seskind agreed with Dr. Crain's summary regarding his medical history, yet opined Mr. Miller was "not really disabled and I would agree with Dr. Crain that there is no real evidence that he is disabled and incapable of performing his duties." *Id.* at 6.  Despite these obvious inconsistences in the WME reports, AA did not seek to solicit clarification or corrections.

In contrast, the WME physicians' reports in Mr. Meadows's case were neither internally inconsistent nor unsupported by the evidence.  The physicians' reports indicate the doctors adequately reviewed Mr. Meadows's file including the reports from his treating practitioner and analyzed each of the diagnoses cited by Nurse Ross in her reports, namely depression and bipolar II.  There is nothing in the record to indicate the WME physicians' reports were procedurally or substantively deficient.

Third, in *Miller*, the Third Circuit placed significant emphasis on the fact that the termination letter made no mention of Mr. Miller's specific diagnoses nor the precise

information lacking from his file.  *See Miller II*, 2011 WL 208291 at *11–12.  The court found

the letter did not provide specific reasons as to why Mr. Miller was no longer eligible for

benefits.  *Id.*  In the instant case, the termination letter sent to Mr. Meadows did explain with

specificity the reasons Mr. Meadows's benefits were being terminated and the information

lacking from his file.  (*See* AR 29–31).  The letter analyzed why verification of Mr. Meadows's

disability could not be established, citing to specific reports provided by his treating practitioner.

(*See id.* 29).  In addition, the letter explained his file lacked "results of any objective assessments

or standardized scales such as the Hamilton Rating Scale, Hopkins Symptom Checklist, or

Clinical Global Impression Scale" to confirm the existence of his disability.  *Id.*  Thus, Mr.

Meadows was explicitly advised of what kind of information could be provided to support his

claim.

Mr. Meadows also points to the Third Circuit's statement in *Miller* that "in the absence

of any meaningful evidence to support a change in position, American's abrupt reversal is cause

for concern that weighs in favor of finding that its termination decision was arbitrary and

capricious." *Miller II*, 2011 WL 208291, at *8; (*see* Pl.'s Reply  7).  However, in reaching that

conclusion, the court focused on the fact that not only had AA initially granted Mr. Miller's

claim for long-term disability benefits, but four years after that initial determination of

eligibility, AA once again undertook a review of Mr. Miller's case, and, after initially

terminating his benefits, decided to reinstate those benefits, finding Mr. Miller continued to

qualify as disabled under the plan.  *Miller II*, 2011 WL 208291*,* at *7–8.  In the instant case, the

termination of benefits and subsequent appeal constitute the *first* time Defendants conducted a

comprehensive review of Mr. Meadows's claim following the initial eligibility determination.

Lastly, in *Miller*, the Third Circuit placed particular emphasis on the fact that the

termination letter was misleading regarding the evidence Mr. Miller needed to produce in order to obtain a favorable consideration of his claim in the future.  *See id.* at *11–12.  In particular, the termination letter misadvised Mr. Miller that "[i]n order to receive further favorable consideration, you will need to demonstrate that you are actively pursuing your FAA medical certification" when his pursuit of an FAA medical certificate was irrelevant to his eligibility for long-term benefits.  *See id.* at *2, 9, 12.  Not only was Mr. Miller misadvised in the termination letter, when Mr. Miller subsequently contacted AA to further inquire regarding the information he needed to provide to support his appeal, AA simply referred him back to the misleading termination letter.  *See id.* at *2, 11–12; *Report & Recommendation*, at *14 ("[B]y referring [Mr. Miller] back to the original termination letter, Defendants were directing [Mr. Miller] to a document that specifically instructed him to take steps that were not even required under the Plan to qualify for disability benefits.").

Although Mr. Miller's failure to apply for FAA certification was essentially the only clearly articulated basis for denial cited in the termination letter, this failure did not constitute a valid basis for termination of benefits under the Plan.  Nonetheless, both AA and the WME physicians placed significant weight on Mr. Miller's failure to apply for an FAA certificate.  *See Miller II*, 2011 WL 208291, at *12.  The court concluded that the defendants' reliance on non-existent plan requirements was arbitrary and capricious.  *Id.* at *9 ("American's imposition of this requirement is a factor that counsels towards finding that the termination decision was arbitrary and capricious.").  In contrast, in the instant case, Defendants and the WME consultants based their determinations on the finding that Mr. Meadows's disability could not be verified, and this constitutes a valid basis for denial of benefits under the Plan.

In conclusion, while the instant case is similar to *Miller* in that AA terminated the

Case No. 10-22175-CIV-ALTONAGA/Brown

benefits of a pilot in a somewhat abrupt manner, this case lacks the procedural deficiencies present in *Miller*.   A review of the Third Circuit's opinion in that case reveals it was those procedural deficiencies that influenced the court's decision to reverse the denial of benefits.

### 6.  AA's Prior Approval of Benefits

Finally, Mr. Meadows asserts Defendants' determination "was arbitrary and capricious considering [their] prior treatment of his claim."  (Pl.'s Resp. 7).  In particular, Mr. Meadows contends the determination was unreasonable in light of Defendants' prior approval of his disability claim for approximately three and a half years despite the lack of standardized test results.  (*See id.*).

Defendants do not dispute they approved Mr. Meadows's initial claim despite the lack of standardized tests or scales evincing the illness.   Nonetheless as permitted under the Plan, Defendants performed a review of Mr. Meadows's file when after three and a half years, Mr. Meadows continued to request benefits based solely on his subjective complaints.  Defendants' prior approval of Mr. Meadows's benefits does not preclude them from later determining Mr. Meadows does not qualify for benefits.

Indeed, the Eleventh Circuit has held that a prior approval of benefits does not prevent a plan administrator from subsequently finding the claimant fails to show ongoing disability.  *See Stiltz v. Metro. Life Ins. Co.,* 244 F. App'x 260, 265 (11th Cir. 2007) ("[The plaintiff] argues that [the administrator's] payment of disability benefits for nearly two years should weigh against its decision to discontinue benefits.  We have never held that such a fact is a relevant consideration when we review the denial of benefits under ERISA."); *Gipson v. Admin. Comm. of Delta Air Lines, Inc.*, 350 F. App'x 389, 395–96 (11th Cir. 2009) (mere fact that employee had previously been approved for receipt of long-term disability benefits was not forever binding on the

36

company); *Ruple v. Hartford Life and Accident Ins. Co.*, 340 F. App'x 604, 613 (11th Cir. 2009) (rejecting argument that because plan administrator previously awarded benefits, the burden shifts to the administrator to prove claimant is no longer entitled to benefits).  Defendants conducted a review of Mr. Meadows's file and terminated his benefits after they could not verify his disability, both of which are actions they had authority to take under the Plan.  The mere fact Defendants approved Mr. Meadows's claim for benefits in the past does not establish the subsequent termination was unreasonable.

Moreover, even if the Court does consider the previous payment of benefits, it does not change the Court's conclusion that Defendants' decision was not arbitrary and capricious.  The record reflects Mr. Meadows's treating practitioner generally submitted optimistic reports regarding Mr. Meadows's ability to work and consistently stated he had no psychological limitations to performing his job.  It was only after advising Mr. Meadows of their need for additional supporting evidence, and receiving none, that Defendants made the determination to terminate benefits.  Defendants then relied on the reports of two independent medical doctors, selected by both the Pilot's Union and AA, who after reviewing the file, found no evidence of any illness that impaired Mr. Meadows from performing his job.  Lastly, after conducting another review of all the evidence, the PBAC determined the termination of benefits was proper.

Essentially, Defendants, when presented with conflicting medical opinions, relied on the conclusions of two qualified medical doctors.  In fact, the Plan and the collective bargaining agreement agreed to by AA and the Pilots' Union required the use of the jointly selected independent clinical authority (WME), and, under the Plan, the PBAC is bound to accept the medical opinions of WME.  The Court simply cannot say Defendants' decision to terminate Mr. Meadows's benefits was unreasonable.

37

### D. Conflict of Interest

The only remaining step in the *Williams* analysis is to determine whether Defendants had a conflict of interest that tainted their decision. "If the benefit plan gives discretion to an administrator who is operating under a conflict of interest, the conflict is to be weighed as 'a factor' in determining whether there is an abuse of discretion . . . with the burden of proof remaining on the claimant to show that the administrator acted arbitrarily." *Miller v. Prudential Ins. Co. of Am.*, 625 F. Supp. 2d 1256, 1264 (S.D. Fla. 2008) (citing *Doyle*, 542 F.3d at 1360).

The parties dispute whether Defendants had a conflict of interest in this case. Mr. Meadows asserts a conflict of interest exists because Defendants both determine the eligibility for benefits and pay such benefits. Defendants maintain there is no conflict of interest because the benefits are paid from a trust, which is funded through periodic, non-reversionary contributions.

The Eleventh Circuit has previously held no conflict of interest exists where plan benefits are paid out of a trust funded by periodic and non-reversionary payments by the employer. *See Townsend v. Delta Family-Care Disability & Survivorship Plan*, 295 F. App'x 971, 975–76 (11th Cir. 2008); *White*, 542 F.3d at 858 ("'Our circuit law is clear that no conflict of interest exists where benefits are paid from a trust that is funded through periodic contributions so that the provider incurs no immediate expense as a result of paying benefits'.") (quoting *Gilley v. Monsanto Co., Inc.*, 490 F.3d 848, 856 (11th Cir. 2007)). Nonetheless, some courts have interpreted the Supreme Court's opinion in *Glenn* to institute a broader view of the existence of a structural conflict of interest. *See, e.g., Miller II*, 2011 WL 208291, at *6 ("The Supreme Court's broad view of whether a conflict of interest exists, therefore encompasses an arrangement where an employer makes fixed contributions to a plan, evaluates claims, and pays

38

claims through a trust.") (citing *Glenn*, 554 U.S. at 112).   This is because "[e]ven in an actuarially grounded plan, the employer provides the monetary contribution and any money saved reduces the employer's projected benefit obligation."  *Id.* (citing *Glenn*, 554 U.S. at 112). Still, the Supreme Court recognized that a conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce the potential bias and to promote accuracy."  *Glenn*, 554 U.S. at 117.

Here, even if the Court determines there is a structural conflict, AA has taken active steps to reduce any potential bias — i.e., by using a trust funded through non-reversionary payments and requiring the involvement of an independent medical consulting entity when disputes over eligibility arise.  Furthermore, the Court is unaware of any evidence of "a pattern or practice of unreasonably denying meritorious claims, of reliable evidence that was disregarded, or of the production of only selective medical evidence."  *Williams v. Hartford Life & Acc. Ins. Co.*, No. 8:02-CV-85-T-17MAP, 2010 WL 557265, at \*13 (M.D. Fla. Feb. 12, 2010); *see also Prudential Ins.*, 625 F. Supp. 2d at 1266 (noting, even where a conflict is present, a lack of evidence of "malice, self dealing, [or] a parsimonious claims granting history" renders the conflict of low importance).

Thus, any structural conflict of interest would weigh only slightly in favor of Mr. Meadows and would not alter the Court's determination that the balance of the factors requires a finding that Defendants' determination was reasonable.

## V. CONCLUSION

Based on the facts, the language of the Plan, and the relevant medical records, the Court finds that even if Defendants' termination of benefits could be regarded as *de novo* wrong, the decision was not arbitrary and capricious, and thus must be affirmed.  Accordingly, it is

39

Case No. 10-22175-CIV-ALTONAGA/Brown

**ORDERED AND ADJUDGED** as follows:

1.  Plaintiff's Motion for Summary Judgment **[ECF No. 31]** is **DENIED**.

2.  Defendants' Motion for Summary Judgment **[ECF No. 29]** is **GRANTED**.

3.  Pursuant to Federal Rule of Civil Procedure 58, final summary judgment will be

    entered by separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 24th day of March, 2011.

_____

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:  counsel of record